I may proceed. Good morning. May it please the Court, I'm Todd True and I represent the Petitioner Northwest Resource Information Center. I'd like to reserve five minutes of my time for rebuttal. Let me start with the core issue that I think is the thread that runs through this entire petition. The Power Council has to be accountable for determining whether and how the 2014 Fish and Wildlife Program actually meets the substantive requirements of the Power Act to protect, mitigate, and enhance fish and wildlife. It has to address that standard and support its decision with reasons. The 2014 program doesn't do that. First, the Council couldn't really make that determination because the 2014 program still doesn't include the necessary measurable biological objectives to inform such a determination, even though the Court said in NRIC 1 more than 20 years ago that those objectives are necessary. And the record says explicitly that the biggest missing piece in the program is measurable biological objectives. And we mention that site, that record evidence, in our reply at 2021 and in our opening brief at 13 to 18. Second, the Council didn't make that substantive determination because it treats its role in adopting a fish and wildlife program as procedural. Accept or reject recommendations from the fish and wildlife agencies without making that substantive determination whether those recommendations are sufficient to meet the Power Act's substantive requirements. And finally, because the program doesn't address and decide whether it meets the Power Act's substantive standards, the Council never fully engages the central both-and structure of the Power Act itself, adopting a fish and wildlife program that protects, mitigates, and enhances fish and wildlife while also providing the region a reliable power supply. There's a good example of this problem on page 266 of the program itself. That's in Appendix S, the response to comments. It's Volume 2 of the ER, page 209 of 278. Unfortunately, that volume is not bait-stamped. But that's where the Council summarizes its decisions about what fish protection measures it's going to adopt for the main stem of the Columbia and Snake Rivers. And the summary is a collection of reasons, procedural reasons, for what the Council did. It says we accepted the recommendations that were consensus. Some of the recommendations that we didn't accept weren't a consensus, and we don't think they're quite ready for prime time. Some of the recommendations came from the public, and we don't accept those. But there isn't any, and so the recommendations that we do accept are sufficient to meet the protect, mitigation, and enhance requirement, and here's why. As I say, that failure runs through all of the issues in this case. Let me talk about those for just a few minutes. Let me turn first to the one of biological objectives. As I said, the record is clear that without objectives, it's not possible to assess where we are on the playing field of achieving protect, mitigate, and enhance. The Council staff said that. The Independent Science Advisory Board said that. And no one has said otherwise. And if you look at Appendix D to the Fish and Wildlife Program, which is objectives, what you will find is a long list of goals, a few of which have objectives and measures. Those all come from the biological opinion under the Endangered Species Act. Let me stop there and ask you, simply because something comes from one of the BIOPs related to the Endangered Species Act doesn't mean that it also couldn't be one of these measurable objectives, does it? Absolutely correct. They're not mutually exclusive. No, they are not. So when you take theóI thought one of your arguments seems to be that they don't have enough objectives. They have some, but not enough. Is that fair? There's two problems with the objectives that they have. If you look at Appendix D, there are a whole lot of goals there, and there are many objectives that say to be developed, to be adopted, forthcoming. And that's where we've been for the last more than ten years. There are some objectives that are there. They're the ones that are taken from the biological opinion. They could meet the requirements of the POWER Act, but we know from what the Council has said that that substantive protect, mitigate, and enhance requirement is different from the requirement under the Endangered Species Act to avoid jeopardy. We actually know that the Counciló you still could have the same objectives that would be able to comply with each of the statutes, right? You could, yes, Your Honor. And are you asking us to figure that out? I mean, it seems to me that's not really our role. No, we are not. The focus here is on the Council has not said these actions meet that substantive requirement, protect, mitigate, and enhance, and here's why. And as long as it avoids that question and doesn't address it squarely, then it can go along without biological objectives to help it measure where it is in achieving that objective. It can continue to say, we'll defer that later. Okay, so let's say we have a bunch of goals and then we have less objectives, lesser number. So we have a little list of objectives. If they were to go back now and say, check, check, check, these objectives in our view meet the POWER Act's mitigation, et cetera, language, what would be the difference? It's a little bit different than that, Your Honor, I believe. The purpose of the objectives, they're kind of a yardstick. Sure, it's to be able to have some measurement. Right, and so what the Council would have to do is say, here are the objectives that we've now adopted. And they did say that. They took some from the Endangered Species Act. There are a whole bunch that they don't have, and I want to come back to that. All right, so let's take the ones they do have. They do have, yes. Okay, what they haven't done is explain and make a determination that those objectives that they have adopted are sufficient to meet the protect, mitigate, and enhance requirement for anadromous fish that go through the power system. So where is it in the POWER Act that says they need to take that step, apart from simply saying we adopt these objectives consistent with both the POWER Act, and they existed under the ESA? Right. So here's where I think that breaks apart. Maybe you could answer the question, Mr. True, because this is a pretty important question. Where does it say that? The POWER Act itself says that its substantive requirement, that the Fish and Wildlife Program is supposed to protect, mitigate, and enhance fish and wildlife. It would be a unicorn in sort of agency-type decision-making to have a substantive standard like that, that the agency did not need to decide whether its actions met and explain why they did. Isn't the adoption of the objections pretty good evidence that they think it meets the statute? Well, Your Honor, the court has said many times that if the agency doesn't explain why its action meets the requirements of a statute, we can't infer that reasoning. We can't supply that basis. They have to tell us why they think that. Where we are now is that the Power Council adopts objectives, it adopts a program, and the implicit, unstated, unarticulated conclusion that we are to take away from that is that that meets the POWER Act, but there isn't any discussion. There isn't any, and this is why these actions are sufficient to protect, mitigate, and enhance. So if I boil it down, you're basically saying that there's not sufficient explanation as to the objectives that they did adopt. Or anything else in the program. And it's not just that there is an insufficient explanation. There isn't a determination with an explanation. It goes beyond that. If the counsel had to explain its actions, we would know whether we have gotten 25 percent of the way to meeting the protect, mitigate, and enhance requirement, 50 percent of the way, only 10 percent of the way. We would know, for example, and this is very important, we would know if we weren't complying with that standard, the counsel would know that it needs to adopt additional measures, and it would then have to think. But see, that now is an additional requirement you seem to have imposed. We started out with we have these objectives, but we don't know. There's no explanation that these meet the Power Act language. But now you're saying they need to go further than that, and they need to tell us on some yardstick where we stand. I'm going to sort of the second. There are two pieces to the Power Act that you have to put together. One is the requirement to protect, mitigate, and enhance fish and wildlife. The other is to provide a reliable power supply. And what the Act says is we want to put these two on equal footing. We want to be sure we're doing both. We want to protect, but we want a power supply. We want to do both. And if you look at the Court's decision in RIC-2 from a couple of years ago, where the issue was could we do more to protect, mitigate, and enhance, and still meet that power supply goal, that's what never gets addressed here. And that's where I was going with the more question. So, for example, in that case. So you're really, I mean, when I read your brief, it seemed to me that you were suggesting that the Council equated compliance with the ESA as compliance with the Northwest Power Act. And so I looked at it and said, okay, there's no question the Power Act expressly recognizes that measures in the Council's fish and wildlife program should complement other environmental initiatives. Correct. So if, in fact, the Council then enacts or contains or has a program that contains a suite of measures which were affecting these andromedous, and I don't say it right, but I'm from Idaho, fish beyond those contained. They have those fish over there. I know they do, but I don't say their name over there. I especially leave it out. Beyond those contained in the ESA, then it seems to me they haven't substituted the ESA. And I looked at the reintroduction of fish above the Grand Coulee Dam, which the Spokane tribe suggested. I looked at the measures to protect the white surgeon and the burbot, and again, burbo, burbot, from the Kootenai tribe, which was above. It seemed to me that the mainstream flow and passage objectives in the 2004 program were largely based on the BIOPS. However, the Council didn't receive any alternative to those, and the passage measures and objectives included in the BIOPS that it could have considered. No party objected that the BIOPS measures and objectives didn't serve to protect the basin fish populations. So I said, they didn't have anything opposite. And so then I'm saying to myself, I can't really say this is just the ESA. So let me focus on two separate things here. There are a suite of measures from the ESA that protect the salmon and steelhead that go up and down the river, and then there's measures to protect other fish and wildlife species. But the point here is that adopting those measures from the ESA without explaining why and making a determination that they are also sufficient to comply with the POWER Act is a problem because the Council has said that the POWER Act actually sets a higher substantive standard than the ESA. So on its face, the idea that what comes from the ESA is sufficient to comply with the POWER Act doesn't square up to what the Council has said is the difference between the ESA and the POWER Act. But, you know, I'm really having trouble exactly seeing what they need to do because, yes, we know they're not coextensive, but we also know that if you had certain provisions that you adopted under the ESA or mitigation factors, those well could be objectives that would be sufficient under the POWER Act, correct? Right. And it seems to me if they say, okay, we have these and now under the POWER Act, in terms of our procedures, what we're going to do is we're going to have these, let's just say, five objectives, the only thing missing is that they're not saying, oh, and they may comply with the ESA, but they also do comply with the POWER Act. And that's why we're putting them in this. If they had reached that conclusion, they would have had to offer an explanation for why something that scores a 2 also scores a 5, and they didn't do that, if you follow that. I do. You have about five minutes left. I do, Your Honor. Maybe we'll ask the 2 and the 5 to your colleague here. And we will come back in a few minutes. Thank you. Thank you. Thank you. I think that's high enough. All right. Good morning, Your Honors. May it please the Court, my name is John Schertz, and I'm the General Counsel for the Northwest Power and Conservation Council. Before I begin, I do want to acknowledge and thank all of the respondent interveners who participated in this case in support of the Council's decision, the representatives are here today, they all agreed to defer participation or argument to the Council's arguments. We thank them for that. Thank you. So our position is very, I think, easily summarized in a framework that's just got, in my sense, five logical steps to it. So number one is Section 4H of the Northwest Power Act is unusually prescriptive in telling the Council how to amend the Columbia River Basin Fish and Wildlife Program, and it's prescriptive both process and substance. Second, the statute is particularly clear that the Council is to develop the Fish and Wildlife Program on the basis of recommendations for program measures and objectives that begin a program amendment process. The statute puts particular emphasis on developing the program on the basis of the recommendations and the views, activities, and expertise of the federal and state fish and wildlife agencies and the region's Indian tribes. And they're the ones who recommend to us the measures and objectives that, together, when we put them in the program, protect, mitigate, and enhance fish and wildlife. Not the public. And the public, too. One particular deference is given in the statute to the recommendations, the views, expertise, and activities of the agencies and tribes. So three, in the only time that a Council decision to amend the Fish and Wildlife Program has ever been before this Court, in 1994, the Court vacated the Council's decision to adopt that program precisely because the Council did not properly rely on the program recommendations that came to the Council, particularly not those of the Fish and Wildlife Agencies and Tribes, and the Council did not properly explain under the statute why not. So four, we've done eight program amendment processes since 1994. The Council has worked hard to follow the requirements of Section 4H of the Act, as guided by the ruling of this Court in 1994. In particular, the Council develops and approves program measures and objectives based on the recommendations received to begin an amendment process, with particular and significant deference to the recommendations of state and fish and wildlife agencies and Indian tribes. So five, that's precisely how the Council developed and approved the 2014 Fish and Wildlife Program. The Council used the program amendment recommendations that began the process as the material out of which the Council developed the resulting program. This includes all of the program's main stem flow and passage measures and objectives that are the focus of NRIC here. But it also includes the many, many program measures for tributary and estuary habitat improvements, for production activities related to habitat improvements, and for a number of other activities. I don't want to try to simplify this too much, but it would be helpful to do so because we have piles of documents that we've been sorting through. So to try to... I mean, I think they're with you all the way to the end, all the way to your Step 5. And you've basically said, okay, we took some of these recommendations, etc., etc., and we adopted them. They come from a variety of sources. And there... I don't want to simplify too much what they're asking for, but they're basically saying, but you didn't really explain how those meet this higher standard or where we will get then in terms of the scale of the protect, mitigate, and enhance plus having the appropriate power supply. So I'd appreciate your response to that specific argument that was made. So the point is the statute requires us to adopt a program based on measures that will protect, mitigate, and enhance fish and wildlife while assuring the region an adequate, efficient, economical, and reliable power supply. You have to go back to both the statute and the 94 decision of this court. The council is not... on its fish and wildlife function, is not making an independent biological judgment as to what is to be done to protect, mitigate, and enhance fish and wildlife. What the council is doing is taking the recommendations for measures and objectives that come from the agencies, the fish and wildlife agencies and tribes in the region, federal and state fish and wildlife agencies and the region's Indian tribes, and putting that mass of substance together, putting them together as a system and a program. And in adopting that, we are adopting this is the program and the measures to be implemented to protect, mitigate, and enhance fish and wildlife. It's not a higher standard than the ESA. It's a completely different standard. It's a different standard. It's a different standard. It's a different standard that is... some of those activities overlap with the fact of activities that get reviewed in ESA for listed fish, but they are not... On the other hand, we've got thousands of measures. If you look through all the sub-basins, we have 60 sub-basin plans that are part of the program. We have measures and objectives for all of those. Many of those have to do with fish that are not listed under the Endangered Species Act. Some of them have to do with fish that are listed, and Adamance fish that are listed, but have additional actions that are part of our program to protect, mitigate, and enhance. These are separate statutes. We have a particular statute, and in the function of the council in the Fish and Wildlife Program, it's a very unusual statute. You have to go back and read the court's decision in 1994 when it tied the council very distinctly to the substance that comes in the door in the recommendations that begin the process with particular significant deference to the recommendations of the agencies and tribes. And I want to point out that throughout all this process, the region's federal and state fish and wildlife agencies and the Indian tribes participated in the process, gave us recommendations out of which he shaped the program, and then many of them after that also joined this litigation in support of the council and the representatives that are here today. So I think that it bodes well for this is not a case. There are moments when the council has significant issues that crop up in the recommendations as to differences between them, conflicts between them, and that's work that the council has to work with the public and with the agencies and tribes to resolve. And if you want to look in the record, we gave you plenty of examples of where that happened in the 2014 program. Would you address one specific... Sure. ...project proposal or recommendation having to do with the improving the fish or the juvenile fish survival on the John Day Dam? And there seems to be a suggestion in the briefs that there wasn't sufficient explanation as to why that proposal didn't make it, you know, why it landed on the cutting room floor. So we had a set of recommendations for main stem flow and passage measures that came in from the agencies and tribes and others. We had a recommendation that did not come in from any of the agencies and tribes to operate the John Day Dam at the minimum operating pool. We made a decision under Section 4H7 of the POWER Act. You make a decision whether or not recommendations that you adopt. If you don't adopt them, you have to make a finding based on the very specific requirements of Section 4H7. One of those is a requirement that the activities... Basically, you make a judgment whether or not the recommendations fit the standards in 4H6. 4H6 talks about complementing the future... the existing and future activity of the agencies and tribes. But that's not what you said. You... On page 266, you said, we don't adopt these recommendations as to the low flow because the agencies and the tribes don't support them. You didn't say because these recommendations don't complement the existing and future activities of the federal and region state fish and wildlife agencies and appropriate Indian tribes. It may be that it implies that, but that's not what you said. So we had... A different example, of course, is the experiment... Can you address that example? I mean, do you agree that you didn't invoke the statutory language in H... that H7 requires? 4H7, right. So that may be a finding that could have been slightly more precisely worded, but it is the standard that we are not adopting that recommendation that came because it was not one that complemented the future... existing and future activities of the agencies and tribes that had been recommended to us for operations. What convinced you of that was the lack of support by the agencies and tribes. Right, lack of support. No one gave us any recommendations or any comments in support of that particular one in the process. So it wasn't... I mean, as I read it, it was the wrong recommender recommended it, and that's the only reason we're throwing it out. There is bigger than that. So it's a bit bigger that you would have to go back through successive programs in the past. That's a recommendation that's been before the council before. There were times when people did support it. This time, it is not one that was supported by any of the agencies and tribes as an operation to be implemented within the scope of this Fish and Wildlife Program in the next few years. So we did not adopt that one, and we made the finding, perhaps could have been more properly worded, but we made the finding in this case. We did get recommendations for other main stem operations that aren't in the part of the biological opinion that came from agencies and tribes, the Kootenai tribe in particular, with, like, some tweaks to the winter operation at Libby Dam. We have tried to fold that into the program, knowing it has to get, then, worked through separate review by federal agencies and whether or not they'll be able to implement it. So that's one example of many. A history of the program taking in recommendations from agencies and tribes for operations and folding them into the program, and eventually they find their way into federal agency implementation. And, of course, any operation on the river will affect both listed and unlisted fish, and so any operation on the river is going to get an ESA review as well. What about the proposal to study the dam removal? The dam removal, again, was a recommendation that came in from some of the public groups, conservation groups. It did not come from any of the agencies and tribes. It seems to me that all you said there was the same reasons as in the 2010 plan. Right. We have made many decisions for some time on that issue in the council's program. The Northwest Power Act is particularly geared toward how to protect, mitigate, and enhance fish while it's affected by the development and operation of the hydro system. There is, both in the legislative history and the act itself, a sense that Congress accepted the fact of the Columbia River hydro system. Our job is to work to acknowledge what existing power production resources are on the river and figure out how you can protect, mitigate, and enhance with those projects in place. You may operate them differently, and if you do that, you may derate the generation of those projects. Our statute is not about changing the existing system. Our statute is about protect, mitigate, and enhance fish and wildlife in some way with that existing system in place and then walking over to our power plant function and saying what resources are the low-cost resources you add to that system in order to continue to have an adequate, economical, reliable, and efficient power supply. So that is the way we did it. I want to talk particularly about the biological objectives since the fish are talking about it. And here's what I'd say. It is the same, in a sense, same argument that we think responds to everything that they make, which is the Fish and Wildlife Program does include biological objectives as recommended by the agencies and tribes and others. In 1994, one reason this court found that program flawed was because there was a set of flow objectives that were recommended by agencies and tribes of the council under Section 4H2, and the council neither incorporated those in the program nor explained properly in the statute why not. That's not the case here. In this case, we contain biological objectives for the hydro system, quantitative and qualitative. We have biological objectives of various kinds that have been recommended to the council that sit in the main stem provisions of the program that are in the sub-basin plans. We have overall program goal. We have small-to-adult racial goals that are important for the entire basin. Those are all in the program, all based on the recommendations of the agencies and tribes. We have no other recommendations for quantitative biological objectives that came from anybody, let alone from the agencies and tribes, that the council left out of the program and then had to explain why we did not. There is an issue about biological objectives that got raised during the 2014 program, and that's what the NRIC has alluded to. It did not have to do with flow and passage measures. The issue of substance, the major issue of substance in the 2014 program were how do you express the right ratio and metrics of natural population, natural spawning populations, and artificially propagated populations. And we gave you a sites to the... We spent months working with the agencies and tribes and others trying to figure out how in the program at this stage and many years into both habitat improvements and production improvements, that you properly express the metric, and there's a number of them. Percentage of natural origin fish on the broodstock, percentage of hatchery origin fish in spawning grounds. We have a number of metrics and issues about that. The program, the Independent Science Advisory Board and a number of the recommending parties recommended there's a deficiency there we need to fill, but what we didn't get recommended were how to fill it. What we instead worked with the agency and tribes on is how to spend the next few years trying to fill that process, and we'll see what happens when we get to the next program. We didn't quite get to it at the end of Mr. True's argument, which he reserved for rebuttal, but is that the metric issue that he's referring to in effect? At least that's... In my view, that was the metrics issue that we had during the program. That was the real issue of substance that we spent many, many months and a lot of work on. Nobody gave us different metrics, different biological objectives for the program goal as a whole, for maintenance and flow and objectives. And by nobody you mean not only the agencies and tribes, but the public. Public, that would be true. We definitely did it for the agencies and tribes, but that record does not have a set of either measures, especially for maintenance and operations, or for objectives of significance that we didn't deal with, and most of which we included in the program. So I think the point to emphasize at the end, a couple of things I want to emphasize. One of them is we're not going to touch on all the arguments in the time that we have here, but we do want to emphasize we think they're all flawed by the same point. And they are that if you look at our excerpts, the supplemental excerpts of records from the council, we included all the recommendations that came to the council. Took up four of the first five volumes of our record. Another volume and a half are the required comments of the recommendations. That's the material out of which we craft the program. When you look at the petitioner's excerpt of record, the recommendations aren't in there. And that to me is sort of the single best indication I can think of. The problems with NRA's case, they're disconnected from the recommendations, they're divorced from the specific requirements of Section 4H, especially as detailed by this court in the 1994 decision. And so they're divorced from the requirements of Section 4H and what we think is a rather striking ruling of this court in 1994 about how the council is to craft, develop, and approve a Fish and Wildlife Program. So at bottom, to sum up, in our view, to succeed in the case, NRAC has to sort of oddly undo most of the court's 1994 decision that actually bears the NRAC name as well as the basic requirements of Section 4H. It's asking the court to disconnect the council from the recommendations and make independent decision-making and substitute NRAC's views for how we're going to make that independent decision-making in terms of adding different and additional flow measures in deciding whether or not what the agencies and tribes are giving us in particular protects, negates, enhances, adding different objectives that aren't in the recommendations. The statute could have been written that way, but it was not. So in our view, NRAC is asking for a Northwest Power Act that doesn't exist. And if there's no more other questions, that's my time. Thank you. Thank you. Thank you, Your Honor. Let me start out with the NRAC one case just briefly. The way the council has read that case is that as long as it follows the procedures specified in the Act, whatever comes out the other end of that presumptively meets the protect, mitigate, and enhance requirement because all of the reasons for what it did or didn't do are tied to those procedures. Fish and Wildlife Agency recommendations or explain why we didn't take a recommendation from the public. And that reads out of the Power Act. That effectively reads out of the Power Act, that substantive requirement to actually protect, mitigate, and enhance because it means whatever comes in, that's the best we can do, and that's what we act on. Now, let me just also say that it is not correct that there were no other recommendations either for biological objectives or for actions. Well, can I go back? As I understand the scheme here, the council is not an independent generator of these ideas. In fact, it's more of a consolidator, I guess, is maybe one way to look at it. Do you agree with that? Not quite. It is not a super fish and wildlife agency, but it has a substantive duty to protect, mitigate, and enhance. Let me give you an example if I can. Does it also say in the legislation that it is to act based on the recommendations that it receives from the resource agencies, the tribes, and the public? Those are sources of recommendations. But let me just give you an example here to maybe make clear what I'm trying to get at. There was a proposal to increase spill to improve juvenile survival through the system, and that came from the state of Oregon, and it got reviewed, and the answer was, well, it's not quite ready for prime time yet. The council never asked the question, do we need something like, are the recommendations we already have, meeting the protect, mitigate, and enhance, or do we need an additional increment of survival to meet that? It didn't ask that, and it didn't say, if we do, could you, Oregon, and the other fish and wildlife agencies get together and bring us a proposal that would actually implement this spill recommendation and meet the things we're concerned about? We'll amend and put that into the program. They can do that. They don't have to be a super fish and wildlife agency to do that. They just have to decide, have we met protect, mitigate, and enhance? If we haven't, then we need to do more. Where can we go for more? It could have been John Day Drawdown. It could have been spill. They have a whole lot of tools that they're not using because they say, if there's not consensus from the fish and wildlife agency, then we don't need to worry about it, or if there's disagreement, then we can explain why we're not doing it, or if it comes from the public, that doesn't matter so much. They're all focused on procedures, and the NRIC court was not telling the council that the only thing that matters in the POWER Act is following the procedures. So the bottom line here is, again, with the biological objectives. If you look at our brief, the council staff itself said, we have enough information here to adopt biological objectives this time around if you want to do it. That got sidetracked into a discussion about hatchery fish, and ultimately the council said, we're going to do what we did before, which is continue to discuss this. They could have at that point said, we've got a lot of information about biological objectives. Here it is. We want you to come back to us in three months or six months and propose a set of biological objectives to us so that we can actually measure where they were meeting, protect, mitigate, and enhance. They don't need to be a superficial wildlife agency to do that. So they also had other substantive biological objectives that they could have done the same thing with. The public said, why don't you adopt the ESA-based recovery population numbers for these anadromous fish as a basis for deciding whether you're protecting, mitigating, and enhancing. Then we'll know. You know, we've got 1,000 fish now, and the recovery goal is 10,000 fish, so we haven't met protect, mitigate, and enhance. The council didn't do that because it didn't come from the right place and it wasn't agreed to by the fish and wildlife agencies. It didn't say, well, yes, we do need some population goals, although it kind of said that. It just said we're going to study it a while longer. There's no effort, because the council doesn't engage and make a determination and make an explanation about this protect, mitigate, and enhance standard. There's no backstop to this procedure. We just go on and on following procedures, and the duty, the substantive duty, that this Court found in NRIC 1 that it talked about again in NRIC 2 never gets on the table because the council doesn't have to say where it is on the map. And let me just point... I mean, where the rubber really hits the road on this comes up in NRIC 2, where the Court talks about this sort of interplay between a reliable power supply and fish and wildlife protection. And what the Court basically said there is there's a bunch of ways of counting for these fish and wildlife costs that may affect whether you have a reliable power supply. And that really makes a difference, but you're raising that issue in the wrong place. It doesn't come up under undue consideration in the power plan. It's really that's an issue for the fish and wildlife program. And we didn't challenge the fish and wildlife program under that power plan. And so here's what's happening. The council says, this fish and wildlife program is not going to cause a problem for the power supply because it's just too little. It doesn't really matter whether we use this counting method that says $500 million or this one that says $200 million because in neither case is it going to threaten a reliable power supply. Without saying whether this little program meets the protect, mitigate, and enhance requirement, which it doesn't do, then we don't know whether we should be trying to strike a different balance that would force a decision about these costs so that we could achieve the balance that the Power Act requires the council to aim for and to accomplish. Thank you. So thank you, Your Honor. We ask that you vacate the program and remand it to the council and set a deadline for coming up with a new program. Thank you. I'd like to thank both council for your argument this morning. Northwest Resource Information versus Northwest Power and Conservation Council is now submitted and we're adjourned for the morning.
judges: McKeown, Bea, N.R. Smith